Ramey is here for Ferguson, Reed Harris is here for the Commissioner, good morning, and Mr. Ramey you may begin. May it please the court, Travis Ramey on behalf of Thomas Dale Ferguson, your honors Mr. Ferguson seeks relief from a death sentence because he received ineffective assistance from his trial counsel and because he is intellectually disabled. Obviously subject to the court's questions, I'd like to focus first on Mr. Ferguson's ineffective assistance claim that's based on trial counsel's failure to present mitigation evidence regarding the abuse that he and his mother suffered at the hands of his stepfather and then move on to discuss Mr. Ferguson's Atkins claim. Mr. Ferguson's ineffective assistance claim based on mitigation evidence at sentencing is controlled by this court's decision in Williams v. Allen. The court's decision in Cooper v. Secretary and the Supreme Court's decision in Wiggins v. Smith are also very close. This is a Strickland claim so we look at first deficient performance by his counsel and it's fairly well established that when counsel receives notice of a potential mitigating circumstance that there is a duty to investigate the possibility of presenting that evidence. How far does that duty extend? Well, your honor, I think it certainly extends to any mitigating circumstance that appears to have a substantial basis and that is likely to have some effect on the courts. I agree with that. I'm sorry my question wasn't clear. How far does the duty extend to then investigate that? In other words, how many leaves on the tree do you have to shake before you meet your constitutional duty to investigate that thing that could have a substantial effect? Well, I think the case law, Judge Luck, refers to reasonableness and in this case, I don't think it's much of a stretch to say that whatever the boundary of reasonableness is, we didn't get anywhere close to it here. So here's how I understand it and correct me if I'm wrong on the record. So your client divulged, so Dr. Chudry was hired, I'm sorry if I'm mispronouncing that name, to do a mitigation investigation and to prepare a report. He interviewed your client. Your client told him about at least one incident where he was physically assaulted and mentioned the incident about the bushes where he was chased after by the father. Didn't talk about the gun and didn't disclose routine beatings. Then an investigation was further done to talk to the mother, to talk to the wife, and to talk to the grandmother, the people who are closest to your client. And none of them, it appears, disclosed any of this. At that point, what more are we to ask counsel to do where you've gone through the main avenues, you've asked your client about something, you've then asked other people about it. We then say that you're still required to go and to run down every single person that had interaction with your client such that they know for absolute certain and sure that this is the only incident that happened regarding childhood abuse. No, your Honor, I don't think you're required to use your analogy to pick every leaf off the tree. However, the evidence in this case, as I recall the record, is that there was a conversation with Ferguson's mother and one of his brothers. The conversation lasted .7 hours. We're talking less than 45 minutes. That's the only meeting that was ever had with Ferguson's mother. But if they disclose he had a great childhood, there's been no abuse, there really isn't a lot to talk about if you've asked all the relevant questions and you've gotten no information that would further go down the hole for there. So we know that the brother was talked to, one of them, we know that the mother was talked to by counsel. But Dr. Chudry, in his report, also indicated that he had separate interviews that were far longer, I would suspect, than .7 hours with the grandmother, the wife, and the mother, correct? Yeah, I believe that's correct, Your Honor. It's in his report. It's on the first page. Sure. Okay. So we know that those happen, too. If they don't disclose it, what more is counsel to do to render, again, I'm not talking about the best representation, but constitutionally effective representation? Again, Your Honor, I think the answer here ultimately is he has to engage in a reasonable investigation and .7 hours just simply isn't reasonable as far as the investigation goes. And I think part of the problem we're running into here, Judge Luck, is that there has never been an evidentiary hearing on these issues. If there was a testimony from Dr. Chudry that he spent a substantial amount of time asking these questions and that family refused to cooperate, or from Mr. Glenn, trial counsel, that he asked those questions and that the family volunteered no additional information, I think that your point might be well taken. Don't we kind of have that? I mean, Dr. Chudry did what seems to be a very comprehensive report. In fact, you rely a lot on much of the information that he did. His report is single-spaced and eight pages, single-spaced. And he says right up front, information was made available from a variety of sources, including the following. And this is where we get the information about the abuse. One, interview of family members, including mother, grandmother, and wife. That's including, not exclusive. Two, school records covering academic career. Three, clinical interview of the client of Mr. Ferguson. And fourth, intellectual, academic, and personality assessment devices. So it's not just counsel here. Who counsel hired to do the mitigation seemed to do a significant investigation into these aspects. And if you're coming up on a wall and only hearing about one incident, what more do we want counsel to do, or requiring counsel to do as a matter of constitutional law? Well, Your Honor, I guess what I would say is compare this to the investigation that obtained this evidence from Mr. Williams' mother. She testified to an extensive amount of abuse in his sentencing. And yet, counsel relied on the testimony from the mother and from the information in the PSI. And still, this Court said that investigation was not sufficient because it was incumbent under the attorney's constitutional burden to expand the scope of that investigation and to see if there was additional information that would be available. This investigation was more extensive than the one in Williams, though, correct? Well, it certainly wasn't as extensive in that he did not obtain information from a family member that would allow him to move forward to present evidence. It sounds as though you're arguing for a de novo standard of review, but that's not what we're under. Wouldn't we have to conclude not only that a de novo review would have us expect something different, but also that the Alabama Court of Criminal Appeals was unreasonable when it was gifted by whatever new evidence was produced? Well, Judge Grant, you are correct as far as the standard, because we have, this is an ADIPA case, and therefore it is deference to the Alabama Court of Criminal Appeals conclusion. But the Williams case and the Cooper case, where we had similar levels of investigation, were equally ADIPA cases, and this Court concluded that the investigations there were unreasonable. But what about the second prong? We have to show, you would have to show not only that there was an effective assistance from a performance standpoint, but that it actually prejudiced your client. How can we conclude that that actually was unreasonable for the Court to conclude that it didn't prejudice your client? Well, again, Your Honor, I would point back to the Williams case, and I would point back to the Cooper case, where we have another one of these cases where the available postconviction evidence paints this vastly different picture of the level of abuse than what was presented to the trial. How can we, I want to delve into that. How can we say it's vastly different? Williams certainly used that word, vastly different. But I want to go through you the facts in Williams and what I understand the facts to be here. In Williams, not only was it disclosed that the father in that case, that the beatings were in fact serious assaults with deadly weapons, which wasn't disclosed. We don't have anything like that here. All we have here is with fists and routine abuse, nothing with deadly weapons. And in addition, what the Court goes on to say is that's not the only evidence. But the Rule 32 evidence indicated that Williams' childhood was in fact characterized by an extreme level of deprivation, both physical and emotional. Williams' parents provided him with inadequate food and clothing, neglected his basic hygiene and medical needs, permitted him to roam the neighborhood unsupervised, and ignored his deteriorating academic performance. There's no evidence of any of that here. As I understand the postconviction record, the Rule 32 record, and what we have for review, the only thing that happened here is we know that in the Bushes incident, a gun was pulled as opposed to being chased down, and that there was assaults with a fist, and that the beatings were routine. That's the difference. That's the only additional evidence we have. Your Honor, I think this ties in directly to the Court of Criminal Appeals and the district court's discussion of this being cumulative evidence. It is vastly different to pit the sole statement from Chudy's report that Mr. Ferguson recalled at least one incidence where he was physically abused by his father. That could mean anything against what the postconviction evidence would show, which is routine, extreme physical beatings and coupled with emotional abuse where his appearance was mocked, things along those lines. That was also in Dr. Chudy's report, the emotional abuse, right? Correct. But we're still talking about sort of one-off statements versus that this happened on at least one occasion. That wasn't true with regard to the emotional abuse. Dr. Chudy was clear that that happened regularly, that he was regularly mocked by his father-in-law for having what are called radar ears, I believe. I think that was one of the statements there. But again, there is a difference. It happened on at least one occasion, and this was pervasive throughout his whole childhood to the extent that the only respite that Mr. Ferguson received from this as a child was when his father was traveling as an over-the-road trucker. And at least one occasion versus these beatings being a nearly everyday occurrence of his life are vastly different things. And then as far as prejudice, the prejudice problem, Judge Grant, the no prejudice analysis really sort of rested on this idea that, well, Ferguson got an 11-to-1 jury recommendation against the death sentence, and so that's as good as he was going to do. But that's inaccurate. One, just as a matter of simple obviousness, he could have gotten a unanimous jury recommendation in favor of life without parole, and I don't think it's any stretch to imagine that a trial judge might be more reluctant to override a unanimous jury verdict. Counsel, the CCA, as I read the opinion, gave three reasons for its prejudice analysis. And correct me if I'm wrong as to any of this. Reason one was the evidence was largely cumulative. In that case, they didn't say it was absolutely cumulative, but largely cumulative of what they already had. Number two was that because of his age, he was 24 and we're talking about childhood abuse, the mitigating effect was a lot less significant than it would be if he was closer, if this had happened when he was 18 or 19. And third, having reweighed all the factors, including all the evidence here, we would re—any trier effect would have reweighed it the same way. In other words, it was so aggravated and there was so little mitigating evidence that even this additional evidence wouldn't have changed the balance. Those are the three things the court, the CCA said, right? That's basically correct. So you have to go through and show us why any one, all three of those were unreasonable as I understand it, right? I think that's correct, Your Honor. Okay. And so I think I've already touched on the idea of why this is not, why this is not cumulative evidence. Touching on why the age differential makes a difference. This court said in Cooper v. Secretary that it is unreasonable to discount a person's background to irrelevance based purely on their age. And in fact, I can't remember the case— But that's not what the CCA did, right? What the CCA said is this, even including all this stuff, given the age, would not ultimately outweigh the other factors in the case, right? It didn't say it's irrelevant or it's not mitigating at all. It just said that the weight that it would be given would be not enough to tip the balance in favor of a different result. I concede, Your Honor, that the court did not use the word irrelevant, but it seemed to assign absolutely no mitigating weight to this at all. And I don't think that it is reasonable to say that in light of the fact that with the presentation of this evidence, there's a reasonable probability of a unanimous jury verdict in favor of life without parole, and that in light of this evidence, there's certainly a reasonable probability that the sentencing judge finds an additional mitigating circumstance, that the balance comes—that there's no—that all reasonable jurists would agree that there's no probability, no reasonable probability this balancing comes out different. But counsel, how could that be where we ourselves—I'll quote the Tompkins opinion, but we have a lot of them—where we've said, quote, where there are significant aggravating circumstances and the petitioner was not young at the time of the capital offense, evidence of a deprived and abusive childhood is entitled to little, if any, mitigating weight. We're reasonable jurists. I would assume we're fair-minded jurists. We have said—and I can cite three or four of those cases where we've said something similar to that. So it's not that a reasonable trier of fact couldn't say that it should be given little or no weight or extreme weight. It's that it is a factor to consider in determining the weight. I don't see how a fair-minded jurist couldn't reach that conclusion. Well, Your Honor, again, I keep harping on the Williams and the Cooper cases. But the case for prejudice here is at least as strong as the case was in those cases where you had significantly more evidence presented of abuse in both Cooper and in Williams. And yet, in both of those cases, the Court said because there is a reasonable no—reasonable jurists would not necessarily agree that this has to come out that way, that not all—it still shows prejudice. The Court did find that the nature of the crime was pretty horrific. I mean, a father and his son murdered while fishing. That's not comparable, say, to Williams, right? Well, the—I'm trying to—I may be confusing the Williams and the Cooper case, but I think one of them involved a triple homicide and that was for pecuniary gain. So it's not as though the crimes in the Cooper case or the Williams case were exactly garden variety either, Your Honor. So I think if you look at the prejudice analyses in Williams and Cooper, they're very close. It isn't so much the aggravating side of it, though. I have to tell you, of at least all the capital cases that I've seen, this is one of the least mitigating I have ever seen. The trial judge—and he was entitled to make those findings, the sentencing judge—only found three mitigating factors, which seems very, very small, and assigned those three very little weight, next to what I think we all would agree is at least a very aggravated crime. And so even if you add the additional evidence here of childhood abuse, I'm having trouble seeing that where you have such little mitigation at the sentencing stage that that would change the balance, or at least a fair-minded jurist wouldn't conclude that it would not change the balance. Your Honor, I think that, at minimum, there's enough here to have required an evidence on, and to allow a court to weigh what the actual mitigating evidence is against this aggravation, instead of just statements as to what we say we can show. If—at minimum, give us a chance to prove. Why can't a court take it as truth and did all the affidavits, all the statements, and say that even if all this is true, it would not have—an evidentiary hearing wouldn't change that answer, would it? Well, I think it depends on the impact that the evidentiary testimony would have on the trial judge, Your Honor. I think it—again, I think the case for prejudice here is at least as strong, if not stronger, than the ones in Williams and in Cooper. You have eight minutes left. How would you assess our interpretation of Alabama law interpreting Atkins versus Virginia? There seems to be some confusion in our authority with regard to what you need to establish in order to succeed on an Atkins claim. Would you agree with me? Judge Wilson, I absolutely agree there's confusion, and I think if we could do anything, maybe we can clear that up today. Everyone agrees that—I don't think there's any dispute among the parties that an Atkins petitioner has to show significantly sub-average intellectual functioning and has to show adaptive functioning deficits. The dispute seems to be at what phases of life you have to show that, and it's based on language coming out of Smith v. State and some of the Alabama cases that use this word presently. Is it that you have to show those two things as manifested before you reach the age of 18 and currently? Your Honor, I think if you look at the direct appeal cases—these Alabama cases are direct appeal cases—and what the Alabama court is saying is during the developmental period, so before 18, at the time of the crime, and then they use this phrase presently. But based on the analysis in all of those cases, what you can see is that by presently, the court means at the time of sentencing, not for a collateral petitioner decades after the fact. So you don't have to show it both, that you lack those two, significant sub-average intellectual functioning and significant deficits in adaptive behavior, both manifested before you reach the age of 18 and currently? That's my understanding. You have to show it manifests before the age of 18, that it was present around the time of the commission of the offense and around the time of sentencing. But the analysis is not decades later. Okay. Okay. And so, tell me what the trial judge here did not do. How did he apply the wrong legal standard? Then applying that analysis, if that's the correct analysis of Alabama's application of Atkins v. Virginia? Well, first, I think the trial judge focused, as far as IQ scores, focused just a little bit too much on the number 70 in his finding that a majority of his scores were above 70. The scores are what they are. I'm not here to litigate what his IQ scores are. But we know from cases like Hall, we know from Thomas v. Allen, that an IQ score of 70 is not a hard cutoff. No single test is as positive. You can have multiple scores above 70. And as long as, when you take into account the standard error of measure and the Flynn effect here, which was not clearly erroneous to apply, as long as we at least get the bottom end of that range down into the 70 to the 75 range, then the courts move on and have to do the adaptive functioning analysis. Is that? Go ahead. No, go ahead. Well, is it a, as long as we get some scores in that range, courts have to move on and do the second step? Or is it, there was perhaps looking at the light in the, even looking at the light in the most favorable to your client, which isn't the standard, but even if you do, there's perhaps conflicting evidence. And at that point, isn't the standard preponderance of the evidence? And we would have to say that it was clear error of the district court to find that there wasn't a preponderance of the evidence in favor of intellectual disability? Well, as I read the court's order, what it ultimately found was that a majority of his scores were above 70.  Counsel, what the court ultimately found was you, your client did not meet his burden to show by preponderance of the evidence that he had, that his intellectual functioning was deficient based on that, based on that evidence, right? And I would say that's clearly erroneous because we did show enough. Am I right that that's what the, that's what Judge Smith found? I think that's a fair conclusion. I think I almost exactly quoted it. So you're saying that that's clearly erroneous because? Because we did produce sufficient evidence that the court has to conclude based on its own, its own little, its own chart as far as the test goes. Counsel, under clearing the clear and convincing evidence standard, where there is conflicting evidence, what do, what have we said where a trial court picks one and rejects the other? But Your Honor, if you look at, there's a chart in the court's opinion where it lays out the Flynn adjusted scores and the standard error of measure range on that. And six of those scores include, excuse me, I'm counting here, one, two, three, four, five of those include scores where the standard error of measure range is below 70 or it is, extends down to within two-tenths of a point of an IQ of seven. Except for two of them, the trial court discounted based on evidence of malingering, correct? And one of those, the actual administrator said the test results were valid. But yes, Your Honor, that's correct. And there was evidence in the record to suggest that your client did not try his best with regard to those two scores. Whether you agree with that or not, there was evidence in the record to support that finding. The first test, the, was the, I think, 1985 test where the administrator said, I think he could have tried harder. And then there was the accusation of malingering by Dr. Rosen, I believe it was, at around the time of sentencing. I have a question even a step further back. Why was it appropriate for the district court to even have this evidentiary analysis? Because what we would have to conclude, obviously, the original penalty, the original sentencing, all of the trial happened before HEDPA, or before Atkins, right? But there was testimony from two different, two different experts that he was not mentally retarded or he was not intellectually disabled. They used a different term then. He was not intellectually disabled. And that testimony was not inconsistent with the standards that would be applied even post-Atkins. So to my mind, tell me why I'm wrong, the only way we would think that that wasn't sufficient pre-Atkins is to suppose that one or more of those experts would have somehow changed their factual opinion had they understood the Atkins standard in order to get your client out of a death sentence. Is that what we should assume happened? As far as the decision to hold the evidentiary hearing, Your Honor, I think the trial court's conclusion is correct that it was unreasonable. We recognize that intellectual disability is a mitigating factor and intellectual disability as an exclusion from the death penalty under Atkins are discrete legal issues. And it's been the position of the state of Alabama in cases that Dunaway v. State is a good example that these are such discrete legal issues that preclusion doctrines don't apply because there wasn't the same incentive to litigate intellectual disability as a mitigating circumstance that there was is when you're posting it for an Atkins claim. But if you already have evidence that pretty definitively shows at that point that the standard wouldn't be met, what would change? Well, Your Honor, I think that there would be additional incentive for Mr. Ferguson to have obtained additional information showing that he was in fact intellectually disabled beyond what Dr. Chudy said. Did we say in Burgess that where the Atkins issue pre-Atkins was litigated needs to be re-litigated post-Atkins for some of the reasons that you're stating that there's less of an incentive to do it at mitigation as opposed to... Your Honor, in Burgess, the court recognized that pre-Atkins evidence quite often won't be sufficient to determine this. The other thing I would say to your question, Judge Grant, is there may be a forfeiture question here because the state hasn't made that argument. It seemed to have ceded to this hearing. And neither party has briefed this reasonableness question, I think, since 2014. And if the court were inclined to go that way in its analysis, I think it would be appropriate since it's been eight years since that question has been briefed to order supplemental briefing on the question. Can I ask you, Judge Wilson, can I ask one more question? I want to go back to a question Judge Wilson asked. So as I understand what the trial court, what the district court did here when it held the pre-Atkins hearing, the district court ultimately found on the adaptive functioning part of it that he did not have a present deficiency in adaptive functioning, correct? But he found we had presented little evidence to that effect and so you haven't shown. That's right. Isn't that exactly the standard that the Supreme Court set out, present deficiency with regard to functioning? Again, Your Honor, there is this use of the word presently, but if you look at all of the cases, this analysis, the Thomas v. Allen case, which is the closest this Court ever comes to applying this sort of three periods of life analysis under Alabama law for adaptive functioning purposes, the evidence that the Court analyzed in Thomas was all pre-conviction evidence, not evidence of the prisoner's adaptive functioning two decades, after two decades in segregated confinement. So, again, I don't think that presently means presently, as in 2020 in this case. It means presently as in at the time of sentencing. And there is a litany of problems that result if you interpret it that way, both in it serves no purpose under Atkins, sort of the foundational pillars of why society has rejected the execution of the intellectually disabled. There are problems with it complying with medical standards, which we know from Supreme Court precedent that this sort of intellectual disability analysis has to follow the medicine. Doesn't the medical standard say present? Present functioning? In fact, Atkins in footnote three quoted from the then American Association of Mental Retardation, they've changed the name, that quote, that quote defines mental retardation as follows. Mental retardation refers to substantial limitations in present functioning. Your Honor, but then I would also point the court to, I think it's page 25 of our brief where we cite discussion from the AAIDD, which is the same group, saying that it is not possible to assess adaptive functioning for someone who has been in prison, like Mr. Ferguson has. And it would be problematic to ask someone to do the medically impossible. How possible is it to assess adaptive function from, say, 20 years earlier either? Well, Your Honor, we do this sort of retrospective, Judge Wilson, I'm way over time here, so with your leave, I'll. Well, this is an important case, we'll give you a little more time. Thank you, Judge. I think that this sort of retrospective analysis of adaptive functioning is typically what we expect in these cases. We cite in our brief cases, I believe from Mississippi and Idaho, where those two state courts recognize that this is exactly how you have to do this sort of adaptive functioning analysis. Again, the Thomas case, we looked at, when the court looked at adaptive functioning, it looked at retrospective sort of pre-incarcerative evidence as far as adaptive functioning. And ultimately, that is what we are arguing that the district court should have done here. Instead of focusing on- But counsel, isn't it because, as Judge Wilson asked you, I think right up front when he started this line of questioning, that it has to be both? In other words, you have to show the onset at 18 of adaptive functioning deficiencies, and you have to show it presently. And so you have to do both of those things. But Judge Luck, I guess what I would say is it is sufficient to show present adaptive deficits to show pre-incarceration adaptive deficits. We do not also have to show that it continues to exist for decades after. And if you'll bear with me just for one more minute, Judge Wilson, I think here is the greatest problem that results from this. It sort of presupposes that it is necessary to prove 20 year later adaptive deficits to show intellectual disability. Well, imagine a situation in which someone who is sentenced to death can show adaptive deficits in intellectual disability during the minority period, at the time of the offense, and at the time of sentencing, but shows no adaptive deficits 20 years later on collateral review. You would have a death sentence that was unconstitutional when imposed. It was imposed on someone who was intellectually disabled at that time. And somehow that sentence has transformed into a constitutional sentence over a period of years because the defendant's mental health has improved. That seems unreasonable. All right. You've reserved some time for rebuttal, Mr. Ramey. Thank you, Your Honor. We'll hear from the Commissioner, Mr. Harris. May it please the Court, Reed Harris for the State. Mr. Ferguson was convicted of capital murder for killing a man and his 11-year-old son. The murder part of a plan to rob a bank. And more than 20 years after his conviction in Alabama State Court, the District Court here denied his petition for habeas relief for two reasons, the way that Mr. Ramey laid it out here earlier. I'll treat it in the same order, and the Court should affirm the District Court's holding because the Court correctly found that the Alabama State Courts acted reasonably in finding that there was no prejudice for the counsel's alleged ineffectiveness and also that Ferguson failed to show that he is intellectually disabled. I'm happy to answer the questions that the Court directs in whatever order. Actually, I'll take you out of order because I've been curious about this. Do you agree, does the State of Alabama agree that it was appropriate for the District Court to hold the evidentiary hearing on the Atkins issue? No, Your Honor. Why didn't we hear about that? I can't say with certainty, Your Honor. I think that applying AEDPA deference is another way to resolve this case, although it's not necessary here. Just the review that the District Court concluded and the evidence that it heard, Ferguson clearly did not show that he was intellectually disabled. I think that using the AEDPA deference is another way to resolve this case, and that would be another appropriate way to dispose of the case here. But was it inappropriate for the Court to do so? I mean, are you able to cite a case or any authority for the proposition that in a circumstance like this, the District Court cannot conduct an evidentiary hearing to determine whether or not the Petitioner's constitutional rights were violated since we're applying federal constitutional law? Your Honor, I believe it would be in terms of the holding of the hearing itself. My understanding is that it would be an abusive discretion standard, but I think perhaps more helpful is that . . . What case are you relying on? I'm sorry, Your Honor. I can't . . . I believe Pope, a 2014 case, which is 752 F. 3rd, 1254, I believe stands for that proposition. That it would constitute an abusive discretion for the District Court considering a habeas claim to conduct an evidentiary hearing when the matter . . . the merits have been considered by the State Court. Is it? I'm very sorry, Your Honor. No, that is not what I meant. That's . . . the standard of review would be applying an abusive discretion standard, and I . . . Counsel, isn't there a more . . . there seems to be a more fundamental problem, and I think it's the one pointed out by your opposing counsel, which is the way that this happened, as I understand it, and please correct me if I'm wrong, the District Court in 2014 issues a 219-page habeas order in which the District Court denies all claims. A motion for under Rule 59 was filed asking for a new hearing and a new trial, in part because of a lack of evidentiary hearing regarding an Atkins claim. The State opposed that motion, correct? Am I right or wrong on that? I do not believe the State filed a motion in response. It stayed pending for over a long time. Right. So then the District Court grants that motion and says, hey, you know what, I should have had an Atkins hearing based on Burgess and some other cases, right? Yes, Your Honor. Okay. And then the District Court holds the hearing and ultimately denies the Atkins claim, and now we are here. The State didn't oppose and didn't appeal, as I understand it, the interlocutory order granting the new trial motion, correct? That's right. So can we review that order here? As I understand it, the State hasn't briefed this issue that this was error of the District Court or an abuse of discretion of the District Court to hold the evidentiary hearing, correct? That's correct. Okay. And that is not what we're asking for, and that's not what I'm asking here now. Okay. And to be very clear, I think that the appropriate next step, if you will, in considering ad podeferens on this claim is not to remand and to vacate the hearing or those proceedings, but simply to not consider the evidence that is there. And as evidence for that, I think that Cohen v. Penholster, the kind of new seminal Supreme Court case in these issues, but you haven't asked us to do that in your brief even. I don't disagree with you necessarily, but you haven't even in brief said, I want you to ignore what you're saying right now, ignore all the evidence adduced at the hearing and only rely on what the State habeas court, the Rule 32 court, and the CCA relied on, right? That's right. So how can we do that now? Your Honor, I think the court doesn't have to. I think that the court can resolve this case by a de novo review of, a clear error review rather of the district court's de novo review of the evidence. So tell me how you win not giving a deference to there, just reviewing in a de novo way the district court's Atkins, understanding though its findings of fact are reviewed for clear error. Right. So why do you win under that standard? So very briefly, Your Honor, and I want to, I regretfully have left out one of my notes on this point and I'm very sorry for that, but there's authority in this circuit for the idea that the State can't waive this ad pro deference issue, that it's a restriction on courts and these issues are important and I can provide that citation today, very soon. And that is, I want to make the court aware of that, that's not something we've pushed and I don't mean to provoke anything unusual or out of order, but I only mean to say that that is, there is authority for that proposition that the court may want to consider if you do prefer, if the court prefers to approach this as an ADPA issue and considering the Atkins claims through that lens. And why we win. Okay, so based on the district court's proceedings that did occur in this case, it considered the record that was before the State court in addition to the evidence that was adduced at the hearing, some of which was the same, for example, looking at school records that were also a part of the State court proceeding in addition to the additional evaluations that occurred from Dr. King and Dr. Schaefer. So as has already been discussed, the Supreme Court has explained that there are three showings, in Atkins the Supreme Court explained the three typical elements to show that a petitioner should show intellectual disability and Alabama law mirrors those requirements to show Ferguson has shown three things, the deficits in intellectual functioning, which the Supreme Court has described as a primarily test-based metric, adaptive deficits and then onset before the age of 18 when he was still in the developmental period. Ferguson failed to show these and the court can be affirmed on that ground. It's clear that the authority that you're relying upon, Perkins and Smith and Carroll, those cases involve, those are cases on direct appeal rather than habeas, right? So, you know, the court's reviewing intellectual disability closer in time to what we have here. It is closer in time, yes, Your Honor. Okay. The evidence is the same. So in this case, for example, the evidence was trial evidence that came from the evaluations that occurred pre-trial and then the trial testimony from those evaluations. So this is sort of an addition, a different evaluation that we're conducting on habeas review rather than cases where, you know, the court was reviewing intellectual disability closer in time, right? It is the same legal analysis, Your Honor. It is different that there is additional evidence available that the petitioner moved forward requested a hearing, which was granted by the district court. And so there is newly available evidence in the form of the evaluations that occurred in 2017 and 2018. But it's the same legal question being determined, which is whether the petitioner can make those three showings. If the petitioner fails to make any one of those three showings by a preponderance of the evidence and we conclude that the district court's determination was not in clear error on any one of those three, then the claim cannot succeed, right? Yes, Your Honor. That's right. And I think that there's, admittedly, it seems like a little bit of confusion and unclarity about the interplay between the first two of those prongs, which is the intellectual functioning and then the adaptive functioning or adaptive deficits. So as opposing counsel pointed out, I think under Hall, which the Supreme Court explained that if there is an IQ score in the 70 to 75 range, the court can go on to consider adaptive functioning deficits. But it is not the case that intellectual functioning ceases to be a required element of showing. And if the additional evidence does not, is not sufficient to make a change in that intellectual functioning requirement, then the claim must still fail. And here the trial court, again, under its de novo hearing, ultimately concluded that the petitioner had not met his burden with regard to either of the first two prongs, correct? That's right. So if we find that there is not clear error with regard to one, we don't even have to reach the other, especially this issue with whether it's present in terms of at the time of sentencing, present in terms of at the time of the hearing, or present at the time of the crime or anything like that, right? Yes, Your Honor. I think that is right because the court did, in fact, go on to consider evidence about adaptive functioning, and it didn't limit its analysis. I believe opposing counsel made reference to a cutoff in IQ scores, and that is plainly what happened in this case. The district court considered several different IQ tests, and I'd love to run through them because this is a primarily test-based metric, as the Supreme Court has advised, but looking through all of these evidence and really putting a thumb on the scale in favor of Mr. Ferguson in terms of the standard error of measurement and the Flynn effect, considered all of this evidence and made the factual finding that he had failed to establish this element of intellectual functioning. And these start in 1979 when Mr. Ferguson was six years old. That score was a 77, which, again, is generally above the range. The district court consistently applied the Flynn effect, and there was significant part of its opinion in finding on that that the state opposed the application of the Flynn effect, and the Supreme Court recently referenced it as the so-called Flynn effect as a controversial method. This is something that the state didn't think should apply at the district court level, but even applying the Flynn effect, this phenomenon that IQ scores are inflated based on the comparison of the date that they were administered compared to when they were normed by the test creators, even using those metrics still is comfortably above 70 in almost every case, including in the first test. It's just above 70 at the very bottom end of the range, like Judge Grant, I think, referred to, even if we were to consider the bottom end of the range, which the Petitioner's not entitled to that, right, that just needs to consider the range as a whole, because it's a bidirectional concept, and the range indicates that the score is just as likely to be at the high end of the standard error of measurement as it is the low end. But even considering it at the low end, it's still above this range of intellectual disability. What if the district court had concluded that his IQ score was likely to be at the very bottom of the range? Would that be, would that decision on preponderance be clear error? Do you think the district court had room to decide that he showed intellectual disability on that set of tests? Not on this record, Your Honor, and I'm pausing to think and to think about what the court considered, but there was a range, a mini IQ test that we had here, and it may be that if the district court had discredited the evidence about malingering, you know, if there were a different set of facts and a different set of circumstances, such that those IQ scores were valid, then that may leave room for that judgment. But again, there's no evidence in the record to that effect, and instead it was just the opposite. I think Judge Grant asked you, maybe I misunderstood her question, but I think she asked you about that, the test you're talking about, the test when he was six years old. I'm sorry. Even at the bottom of that test, he still would be above. That's right. The intellectual deficiency. That's right. To be fair, I was talking about the breadth of the evidence with the ultimate conclusion. Thank you. The 1985 test, which I believe is the test that opposing counsel focused on today, which was done just six years later when Mr. Ferguson was in school. This was done at his mother's request, apparently, because she was concerned with his schooling, and the test administrator noted there that he gave up easily on both verbal and nonverbal items. The test administrator also noticed that his performance was consistent with the test he had had before, which was that 77 score. So the test administrator, even though looking back in retrospect, again, with the thumb on the scale to Mr. Ferguson, the range dips below that 70 ballpark. We see here the evidence in the record about which the district court made a factual finding that there was malingering and that he didn't give his best effort, and that it's consistent with the score from a few years prior, and that there was no intellectual disability. We see in 1988, which is still part of the state court proceedings and record, the score of 87, which again is much higher. This was again taken as part of school policy, and this is another piece of evidence the district court considered in pointing out that that previous test was likely the result of malingering, and he found as much because of this dramatic jump. That was the reasonable conclusion that the court drew about the other test. And jumping ahead to 1997 and 1998, so this was some of the evaluations that the court was asking about earlier. This is with Dr. Rosen and then with Dr. Chutey, is how I've been pronouncing it anyway. So Dr. Rosen did administer an IQ test, and this was the expert that was hired by the state. This was the score of 69, and the range being between 59 and 69 with all of these efforts, or all the inferences being drawn in favor of Mr. Ferguson, which again is something that he is not entitled to. There again was this challenge, excuse me, again there was testimony of very likely malingering here. This was the same evaluation in which it was noted that Mr. Ferguson said he was seeing little green men that told him to do bad things. And other psychotic hallucinations that even Dr. Chutey said were in question and difficult to substantiate. And so this is, this finding of malingering is very supported by the record, and again this is a factual finding that's not clearly erroneous. Dr. Chutey's evaluation, though it didn't result in an IQ score, I think is also still probative of this intellectual functioning. He said that he didn't conduct an IQ score because Ferguson had been tested so many times already, but that he was certain, or I don't want to say it incorrectly, but he did testify that he was in the borderline range of mental retardation, or excuse me, of intellectual functioning and not mentally retarded as it was referred to then, or having an intellectual disability. So this is again all things in the state court record where his own expert said he did not have this intellectual disability, as did the state's expert, and the IQ scores that were not infected by this malingering also didn't show it as well. And finally, getting to the evidence you're hearing in federal court, we have the... Is that the only evidence with regard to an opinion that he was malingering? Was it with regard to the IQ score of 87? Let me see, Your Honor. Do you mean 1980? So the... There's just one. There's just, I mean, got a lot of IQ scores. Yes, Your Honor. But this only is with regard to one test. No, Your Honor, it was two tests. Two tests. And malingering may not be the exact right word for the one that was taken while he was in school. And again, I don't want to mischaracterize it. And how was that substantiated? By the administrator's notes that he gave up easily on both verbal and nonverbal items. It was the administrator's characterization of the test. In addition to the district court credited the idea that because he had such a dramatically higher score three years later, and that there's nothing in the record to suggest that intellectual perhaps something that was discussed before, that it did not make sense to have this dramatic drop and change in IQ score. Can we talk about that last concept about it being transient? Because that's really where your opposing counsel ended with this hypothetical that somehow you could be intellectually disabled when you're before 18, but suddenly you're not intellectually disabled when you're 40 years old, for example, when there's an evidentiary hearing. Is that how intellectual disability works? Is it curable? Is it something that you are suddenly not intellectually disabled at some point? No, Your Honor. There's nothing in the record to that effect. Certainly. And the state's position on this point in our briefing was that Ferguson failed to show that... I should say absent some sort of like brain injury or something happening in between those times. Right, Your Honor. And it is the position in the briefs that there's been nothing shown to that effect. The state did ask... I don't remember which one of the experts that testified in the federal court evidentiary hearing whether this could be a transient phenomenon or something that happened as referenced in our brief. And no was the answer that was given. So we... Isn't that why Atkins is categorical? In other words, the point of a categorical prohibition is it's an immutable characteristic that stays with you over time. Right. We can't redo the Atkins claim 10 years later if he's intellectually disabled or something like that. I'm not aware of any authority to that effect. And the Ninth Circuit case that the appellant relies on here, even there they say that a defendant's present condition is relevant to the extent it's probative of condition during the relevant period. So the idea that this is unlawful or you can't do it is not helpful. And instead, it's properly viewed, we think, as a way of considering the relevant adaptive functioning characteristics throughout holistically because it's not transient in that way. Can I move to the ineffective assistance of counsel claim? Yes, Your Honor. So your opposing counsel says that the Williams versus Allen case set out the standard by which we judge prejudice in a override case like this one. And the quote that your opposing counsel points to from the Allen case is... Give me one second. The quote, prejudice is more easily shown in jury override cases because of the deference shown to the jury recommendation. That the jury decisively voted against the death penalty even without the powerful evidence adduced at post-conviction weighs heavily in favor of a finding of prejudice. How do we deal with that given that we have a similar override case? And in fact, I think the override here is more significant because it was 11 to 1 as opposed to 9 to 3 in that case. Your Honor, my first point on that is that in briefing and the way that it's been portrayed here, the state's argument is that the jury's determination is evidence not about prejudice, not probative of that question, but on the effectiveness of counsel. So here we have this issue where the jury voted against issuing the death penalty and it showed just how effective counsel was in choosing his arguments and strategy and developing the arguments that he did. Except that, so as I see it though, what I understand us to be saying in Allen and what I think logically would apply is when it comes to an override case, we're not looking at the effect on the jury for ineffective assistance for the reason you've just said. It wouldn't make sense if the argument was that you were ineffective in your jury presentation because you won. How can you be ineffective where you win? It's like, you know, appealing a not guilty verdict. You win. What are you appealing? But here in the override case, the judge is the sentencer. And so our inquiry is whether the judge would be affected by the post-conviction evidence that was not adduced by counsel, since the judge is the ultimate one who imposes the sentence. So back to my question. It seems to suggest that where we say prejudice is shown more easily in override cases because the deference shown to the jury recommendation. In other words, under Alabama law, you have to show deference to the recommendation even though you can override that recommendation. And that where the jury decisively votes against death penalty, even without the powerful evidence, it weighs heavily in favor of finding of prejudice. In other words, that you would, the result would be different given that jurors found that. And so it must be really close case. I think that's how I read that. Am I reading it wrong? What am I missing here? Your Honor, and I'm not trying to, I certainly don't mean to. Only if I'm wrong. It's okay. Sure. I don't mean to avoid the question and I'll get to two parts. In part one of my answer, I'll say just to reiterate that this idea of the jury's I think is most helpful in this effectiveness analysis in prong one, in determining whether counsel was effective in the first place. But as to part two, in terms of prejudice, I think that in this case, for example, we have in the sentencing order where the trial court considered the jury's recommendation and he explained his reasons why he thought that it weighed less heavily in his analysis and that's within his reason judgment. I think that he explained his opinion about the jury. But the problem is that what we're saying in Allen is he, the sentencing judge, I think it's, is it Judge Pride or Judge Hopkins or? Either Tompkins or Pride. Judge Tompkins. That Judge Tompkins didn't have the evidence of the child abuse, which is really what we're talking about here. He didn't have the fact that the beatings were routine, that they were done with a fist, that his own father pulled, his own stepfather pulled a gun on him and, you know, had this They didn't have that color and that extent. So the argument is with that evidence, given, given this closeness, we're in a jury override case that the prejudice analysis is a little more favorable to the petitioner than it would be in a jury verdict case. Your Honor, that may be in terms of the legal standard. I can say that in this case, it is certainly not dispositive. And on the facts of this case, it would not have had a reasonable probability of changing that, that ultimate sentence. In comparing the facts of this case, where as part of a bank robbery scheme, we have a defendant held victims at gunpoint in a boat while his co-defendant drove them to their deaths. They were shot in the head and then dumped into the water. This was something considered by the trial court. And this is something that, considering the facts of the case, of the crime, that What was the jury's vote in that case? In this case, Your Honor, I apologize, 11 to 1. I know in this case, the case that you're referring to now, that you're comparing this case to. Oh, I'm not sure the case that Judge Luck referred to. I was just referring to the facts of our case, Your Honor. And just to try to demonstrate the aggravating nature of the facts of the crime at issue. And in considering that weighed against the relatively low proposed mitigating evidence that Judge Luck had referenced earlier, the aggravating facts of the case were significant. And it's such that the proposed mitigating evidence wouldn't have changed that verdict, or there's not a reasonable probability that it would have changed that verdict. We obviously may not need to get there, but does the state of Alabama think that the investigation done on mitigating evidence was, in fact, sufficient? Yes, Your Honor. And the reason for that is based looking at the strategy that trial counsel pursued. So the trial counsel is not required to seek out every piece of evidence or even every piece of strategy. He went a different direction. Here's the problem with that, though, and I don't want to cut you off, but my issue with that is this. That sort of strategy and our findings regarding that and our case law regarding that is really helpful to the state in an evidentiary hearing case where it's found that this was the strategy. But that's not what we have here. We have a record. There is no finding at all based on strategy because there couldn't be a finding based on strategy because there was no evidentiary hearing based on that. The way that, as I understand, the Alabama summary procedure works is where evidence is sufficient to state a claim, and the claim is specifically alleged enough, we assume the truth of all of it and then determine whether it meets the standard or not. And that's what happened here. So as I understand it, there's no finding anywhere in this record. And show me in the CCA opinion where it uses any language about strategic decisions or not and about ineffectiveness being not ineffective because of a strategic decision. I thought they said it's not ineffective because it's cumulative. You're right, Your Honor. So the three points you pointed to earlier in terms of the reasoning, cumulative and the reason that there was no prejudice shown, I think that the effectiveness part of the analysis, though, is slightly different. And cumulative was part of it. But the strategy of producing these different... Can you show me? I have the state rule 32 order right here and I have a CCA opinion. Can you show me where the word strategy appears anywhere in those? It may not be strategy, Your Honor. Well, here, even if you could get to strategy, can you make a strategy without knowing what's out there? I mean, is .7 enough to determine even .7 hours of interview? Is that even enough to determine what your strategy is? Let's say that in a different case, a little bit more investigation would have revealed a much more powerful case of mitigation. Is this really enough to even develop a strategy? I agree with Judge Locke that I don't think that's what the Alabama court said. But would this be enough in any event? It would be enough to determine the strength of the argument, enough to know whether it should be pursued more is the thought, especially whereas here, the trial counsel, after speaking with Ferguson and evaluating the evidence and trying the case, determined that we had extensive testimony from his wife at trial. Her testimony was longer in page length in any way than the two state's witnesses combined. We also had this heavy reliance on Dr. Chudy about this intellectual disability and his claim that that was a sufficient mitigating circumstance. In using that strategy, using that means of trying to convince the jury of, or excuse me, I'm trying to think of a sentence, and I apologize, Your Honor. I don't believe I answered your question. What's constitutionally required? I mean, what I asked counsel in my questions was, we all agree you don't have to, when you shake the tree, you don't have to pull every leaf, but you got to do something. So where is that reasonableness lying here? When you have indication, because there's evidence, there's evidence of abuse, right? We know there is. At what point do you need to run down that abuse? Because it is a sufficient line, and the premise of Judge Grant's question, which is exactly right, is you can make a strategic decision not to go the childhood abuse route if you want to go, for instance, a residual innocence route, but you got to know what you have before you make the call. Your Honor, I can't put a timeline on how many tenths of an hour it must take, but we have here, we had evidence that he did evaluate in terms of what he had from Dr. Chudy. The discussions that he did have with Ferguson himself and with certain family members to determine what evidence was there, and deploying a strategy, which again, in this effectiveness part of the analysis, that worked on a jury despite the heinous facts of the case, is something that is helpful. And as I believe was referred to earlier, counsel also considered that it had been many years since he was a child. He was, I believe, 24 years old at the time of the crime. He'd been supporting his wife, who was in nursing school for five years at that point. The strategy of seeking this sort of abuse is something that would have been minimally relevant in this sort of the procedures, and the council was reasonably able to make that reasonable decision, and the court was not unreasonable in finding that assistance was not ineffective. Did I understand you earlier to say that in evaluating whether or not prejudice is established pursuant to Strickland v. Washington, we only look to determine whether the mitigating evidence would have made a difference in the judge's determination as opposed to the jury's determination? We don't look at whether or not it would have persuaded the jury? I'm not sure, Your Honor, about the difference between one juror in this case. We did have the 11-1 vote. I think the ultimate question is whether there's a reasonable probability that the verdict would have changed. But a unanimous jury verdict. If counsel was able to convince just one more juror, you would have a unanimous jury verdict, and I believe the law in the state of Alabama even pre-hearsed that the court is required to give great weight to a unanimous jury verdict. Your Honor, I believe that is right. I think the trial court here did explain why he gave relatively little weight to the jury verdict based on the evidence that the jury heard at sentencing. Yeah, he has to give great weight to it. And here, the only aggravating factor was that the crime was committed during the course of a robbery. It wasn't based on the gruesomeness of the crime, which in other cases we've determined has been insufficient to overcome a jury override. Your Honor, that was the only statutory, I see my time has expired, if I can respond to your question. That was the only statutory aggravating factor as a matter of Alabama law. In the end of the sentencing order, the district court did explain the nature of the case, including the fact that this was done by a child, or to a child rather, and his father while they were fishing. He had time to remove himself from the situation, and the bank robbery didn't happen until the next day with the truck that they had stolen. The district court explained its findings, and this was completely appropriate. If this was a post Hearst case, we wouldn't be here, would we? I believe that's right, Your Honor. I think maybe a footnote in the opinion about it. Okay, all right. Brief. I said opinion just now. I meant brief. Excuse me. Thank you, counsel. And Mr. Ramey, you've reserved some time for rebuttal. Thank you, Your Honor. To hit a few points very quickly, Judge Grant, I think the confusion about the standard and et cetera regarding the need to hold the evidentiary hearing is a good example by if the court decides to take that path, that supplemental briefing on this would probably be appropriate. Your Honors, we agree that intellectual disability is not a transient condition, which is why pre-incarceration evidence of lack of adaptive functioning is present evidence of lack of adaptive functioning. We're not saying that present evidence is irrelevant. We're just saying it's not dispositive as to... So your argument has to be that the trial court here considered it as dispositive? Correct. The trial court ultimately, in the analysis section of his opinion, said there's little present evidence of lack of adaptive functioning and goes straight into his conclusions, basically within, I think, two or three sentences. Third, Your Honor, Judge Luck, I think you are reading Allen exactly correctly as to the weight to assign to prejudice in a jury override case. And it also makes sense to me that the more overwhelming the jury verdict was in favor of life without parole, the more, the easier it should be to show prejudice giving the deference. And Judge Wilson, I think you... Except that we have case law from the following year that you even commendably point out in your brief, Lee being an example, where we clearly say that where you win, there's no prejudice. There can be no prejudice in an effective assistance to the jury verdict. Your Honor, I recognize the tension between Allen and Lee. There's actually, I think... That's not a tension if we read it the way that I articulated it, which is Allen applies to prejudice to the judge, sentencer, but Lee applies to the jury as the recommender. Sure, but I think you then dovetail directly into Judge Wilson's discussion about a unanimous jury versus an 11-1 jury. Certainly, it seems that the sentencing judge is likely to give more weight to a jury verdict when it's 11-1 than when it's 9-3, for example, in the Allen case. And 12-0 certainly seems that you're going to get more weight... I don't know how you get around Lee and Parker, where we said, quote, the fact that the jury recommended life imprisonment, and it didn't specify what that recommendation was, just recommended it, counsels against a determination that Lee was prejudiced under Strickland. And Parker said a petitioner cannot, cannot show sentencing-phase prejudice when the jury recommends a sentence of life instead of death. But I don't see how those are reconcilable with Allen, Your Honor, saying that it's easier to show prejudice when you have a jury recommendation, and then the court says you can't show prejudice when there's a jury recommendation. If they apply to the... If the prejudice analysis is whether the jury's verdict would be different, meaning 11-1 to 12-0, then Parker and Lee are directly on point with that. And if Allen is directed at the sentencer, meaning the trial judge, then I don't see how they're in conflict. Your Honor, moving on, the .7 hours that's been referenced, I think we don't know what was discussed in that .7 hours, and I think that highlights the need for an evidentiary hearing. And then touching back on Atkins, I agree that ultimately the Atkins petitioner must show both significant deficits in intellectual functioning and in adaptive functioning. Our point is just that an IQ score of 70 or below isn't dispositive as to whether there is a substantial deficit in intellectual functioning. That's why when the IQ score is close, you go on to analyze the adaptive functioning to determine whether someone with an IQ above 70 functions as though they were someone with an IQ below 70. Though they have an IQ of 73, they can still have a substantial deficit in intellectual functioning. And the Moore case is a great example there. The Supreme Court ultimately summarily reversed the Texas Court of Criminal Appeals and granted relief, even though the petitioner in Moore had a full-scale IQ of 74. What we have here is the district court simply didn't go on to do that adaptive functioning analysis correctly and then reapply it back to the intellectual functioning analysis to determine if Mr. Ferguson, despite having scores above 70, nevertheless functioned as someone who had substantial intellectual functioning deficits. So the remedy here, Your Honor, is to send this Atkins question back to the district court and have the northern district simply redo the Atkins analysis again, and this time to do it correctly. So, Your Honors, we would ask both on the Atkins claim and on Mr. Ferguson's ineffective assistance claim that the court vacate and remand and order an evidentiary hearing on Mr. Ferguson's ineffective assistance claims. All right. Thank you, counsel. Court is adjourned.